The Honorable Richard A. Jones

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

ALLAN B. THOMAS and
JOANN E. THOMAS,

Defendants.

NO. CR19-210 RAJ

**GOVERNMENT'S
TRIAL BRIEF**

## I.    INTRODUCTION

On September 9, 2009, the grand jury returned a Superseding Indictment (the "Indictment"), Docket No 40, against defendants Allan Thomas and Joann Thomas.  That Indictment charges each with a total of 15 counts of (1) conspiracy, (2) mail fraud, (3) wire fraud, (4) aggravated identity theft, and (5) money laundering.  The charges stem from the Thomases' abuse of Allan Thomas position as a Commissioner for King County Drainage Districts 5 and 5A to divert almost the entire budget of the districts, from 2012-2019, to their own benefit.

Defendants' trial is scheduled to start on January 4, 2022, at 9:00 a.m.  The United States will be represented by Assistant United States Attorneys Justin W. Arnold and Andrew C. Friedman.  The case agent at trial will be Internal Revenue Service ("IRS")

GOVERNMENT'S TRIAL BRIEF - 1
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Special Agent Ian Mitchell.  Allan Thomas is represented by John Henry Browne.  JoAnn Thomas is represented by Terry Kellogg.

The Thomases have been released on bond, pending trial.  There are no pending motions in the case.  The United States expects to call approximately 15 witnesses during its case-in-chief.  The United States anticipates that it will be able to present its case-in-chief in four-to-five days, assuming reasonable cross examination by the defense.

## II.    BACKGROUND

### A.    Facts

#### 1.    Background Concerning Drainage Districts

Chapter 85.06 of the Revised Code of Washington authorizes the establishment, and governs the operation, of drainage districts.  Drainage districts also fall within the definition of special districts, and therefore also are subject to Chapter 85.38 of the Revised Code of Washington.  Drainage districts are governed by three-person boards of drainage commissioners, who are responsible for the construction and maintenance of drainage systems, including drains and ditches, designed to control and treat storm water, surface water, and flood water, within the district.

The three members of each drainage district board of commissioners are elected to staggered six-year terms.  If only one person files for a position, however, he or she is considered to have been elected to that position, and no actual election need be held.  A board of commissioners is required to select one of its members as chairman, and to appoint a secretary (who need not be a commissioner).

Each October, a board of drainage commissioners is required to provide the county auditor with an estimate of the cost of maintenance and repair for the drainage district for the ensuing year.  That amount then is assessed against the landowners within the district, and it is collected as part of the landowners' property taxes.  A board of drainage commissioners causes "warrants" to be issued to make payments on behalf of the district.  The commissioners present requests for warrants to the treasurer of the

GOVERNMENT'S TRIAL BRIEF - 2
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   county in which the drainage district is located. The county then issues the actual checks

2   (also known as warrants) to make payments.

3       Drainage commissioners are entitled to limited compensation.  Specifically, a

4   commissioner was entitled to be paid up to $90 per day, not to exceed $8,640 annually,

5   with both amounts adjusted for inflation from 2008.  In addition, commissioners are

6   entitled to reimbursement for reasonable expenses actually incurred in connection with

7   drainage district business.

8       **2.      Allan and Joann Thomas/Drainage Districts 5 & 5A**

9       Allan Thomas is a long-time dairy farmer, who lives on a farm in Enumclaw,

10  Washington.  Allan Thomas is married to Joann Thomas, who previously used the name

11  Joann Copeland and who adopted the name Joann Thomas after marrying Allan Thomas.

12  The Thomases jointly operated their dairy farm under various names, including Thomas

13  Dairy Farm, Inc., and A&L Dairy.

14      King County Drainage Districts 5 & 5A form a single consolidated drainage

15  district located in Enumclaw, Washington (collectively, "DD5").  The Thomases' farm

16  lies within DD5, and Allan Thomas apparently served as a commissioner of DD5 for at

17  least 35 years, prior to his May 2019 resignation, which followed the discovery of the

18  events underlying this case.   Kennet Olson served as a commissioner for DD5 for

19  approximately seven years, before also resigning in May 2019.  The third position on the

20  DD5 board of commissioners was vacant for many years prior to 2019.

21      According to the King County Elections Department, no one – including Allan

22  Thomas and Olson – filed as a candidate for any commissioner position for DD5 between

23  1986 and 2019.   According to a letter written by Allan Thomas and Olson, neither man

24  stood for election during that period because there "never [were] enough candidates . . .

25  to hold an election."

26      Joann Thomas, at least at times, acted as the secretary of DD5.  As such, Joann

27  Thomas was actively involved in submitting requests for warrants to the King County

28  Treasurer, and in handling the district's finances.

GOVERNMENT'S TRIAL BRIEF - 3
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

### 3.     The Thomases' Scheme to Defraud

#### a.     Overview of the Scheme

Between 2012 and 2019, DD5 had an annual budget of $75,000 to $80,000 a year. Beginning no later than 2012, the Thomases caused the vast majority of this money to be paid to a company that they had caused to be set up in the name of Allan Thomas' son, Alexander Thomas.  That company was variously known as A C Services, A. C. Services, and A. Conservation Services.

The Thomases represented that A C Services had performed work for DD5 and caused King County to issue checks in payment of the supposed work.  The Thomases deposited the checks into an account that they had set up in the name of A C Services, and then diverted the money from that account to their own benefit.

When the scheme was discovered in late 2017, and King County no longer would make payments to A C Services, the Thomases recruited a friend to submit invoices from his business, City Biz, for work on behalf of DD5.  The Thomases then caused King County to issue checks to City Biz.  City Biz almost immediately paid the vast majority of the money that it received to the Thomases.

In total, between 2012 and 2019, the Thomases caused $468,165 of the approximately $500,000 budgeted to DD5 to be paid to A C Services and City Biz.  Of that amount, the Thomases diverted $458,947 to their own benefit.  And A C Services and City Biz performed little actual work for DD5.

#### b.     Background

For each of the years 2012 through 2019, Allan Thomas sent letters to King County Department of Assessments asking King County to assess taxes on the owners of property within DD5 to fund repair and maintenance work in DD5.  For 2013 to 2017, Allan Thomas requested that King County levy a total of $75,000 in taxes.  Allan Thomas increased the levy request to $80,000 for 2018.  The King County Assessor's Office assessed and collected the amounts Allan Thomas requested for each of these

GOVERNMENT'S TRIAL BRIEF - 4
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

years from DD5 residents.  The assessed amount was then available for DD5 to hire

contractors to perform maintenance and repair the drainage ditches within the district.

To obtain the funds from King County to pay vendors for work performed on

behalf of DD5, DD5 was required to submit requests for payment to the King County

Treasurer.  To do this, Joann Thomas filled out a spreadsheet provided by King County

and uploaded the spreadsheet to a King County website.  The spreadsheet included the

amount requested, the payee (vendor), the invoice number, the invoice date, and the

vendor's address.  King County did not require DD5 to submit the actual invoices

provided to DD5 by the vendor.

After uploading the spreadsheet electronically, Joann Thomas was required to

send a two-page document titled "Special District Voucher Approval Document" to King

County Accounts Payable by email.  This document included a certification, under

penalty of perjury, that the vendor had rendered services or provided materials to DD5.

The Special District Voucher Approval Documents generally indicated that they had been

prepared by Joann Thomas and were certified to, and signed by, Allan Thomas and,

purportedly, Olson, as the commissioners of DD5.  (As noted below, Olson did not

actually sign the documents – rather, the Thomases forged his signature without his

approval.)

After receiving each Special District Voucher Approval Document, King County

issued a check made payable to the identified vendor and sent the check by mail to Joann

Thomas, who supposedly was responsible for forwarding the check to the vendor.

    c.    *A C Services*

In 2010, Alexander Thomas, Allan Thomas' son from a prior marriage, who then

was approximately 18 years old, was living at the Thomases' residence in Enumclaw or

in a mobile home located on the property.  On November 1, 2010, one or more of Allan

Thomas, Joann Thomas, and Alexander Thomas obtained a taxpayer identification

number from the Washington Department of Revenue for a business named A C

Services.  In the Department of Revenue paperwork, A C Services was described as a

sole proprietorship, owned by Alexander Thomas, performing landscaping services.  The address provided for the business was an address used for the mobile home located on Allan Thomas's property.

On May 29, 2012, Joann Thomas and Alexander Thomas opened a checking (and associated savings) account at White River Credit Union in the name of A C Services. The account opening papers described A C Services as a sole proprietorship, owned by Alexander Thomas, and engaged in "[a]griculture ([a]gribusiness)," located at the same address that had been provided to the Washington Department of Revenue.  Although the account opening papers described the business as a sole proprietorship, they stated that the opening was authorized by the business' governing persons, listed as Joann Thomas and Alexander Thomas.  The papers were signed by both Joann Thomas and Alexander Thomas.  Both Joann Thomas and Alexander Thomas were made authorized signers on the account, and only one person's signature was required to transact business on the account.

Between 2012 and 2107, the vast majority of the requests Allan Thomas and Joann Thomas submitted for payment to King County were for payments to A C Services. Between May 2012 and 2017, King County issued checks totaling $428,170 to vendors in response to warrant requests submitted by Allan Thomas and Joann Thomas on behalf of DD5.  Of this amount, 36 payments, totaling $413,323 (that is, 97% of the total amount paid) were paid to "AC Services."  All 36 checks issued by King County to "AC Services" listed the business' address as the address of the Thomases' farm in Enumclaw, Washington, rather than the address previously provided to the Department of Revenue and White River Credit Union for the company.

Financial analysis, discussed below, shows that almost all of the checks to AC Services were deposited into the A C Services account at White River Credit Union.  The analysis further shows that almost all of the money in that account was then withdrawn in cash, paid to Allan or Joann Thomas or to accounts controlled by Allan and Joann Thomas, or used to make purchases, such as hay, that appear to be for the benefit of the

GOVERNMENT'S TRIAL BRIEF - 6
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Thomases' farm.  Little or no money from the account appears to have been spent for ditch-related work.

Other evidence also suggests that A C Services was not performing ditch-related work for DD5:

### i.    Alexander Thomas

Despite being the purported owner of A C Services, Alexander Thomas has told investigators, and the government expects that he will testify, that he performed only two jobs for DD5, both in approximately 2012.  Alexander Thomas does not recall one of the jobs, but the other involved cleaning a ditch and planting trees on Olson's property. Alexander Thomas did not like doing drainage ditch work, and he did not do any work for A C Services after the two jobs that he performed in approximately 2012.

After stopping doing drainage ditch work, Alexander Thomas continued to live on the Thomases dairy farm for several years.  He performed farm work but was not paid a regular salary.  He lived in a mobile home and, later, a trailer on the property, and was fed by Allan Thomas and Joann Thomas.  Allan Thomas paid miscellaneous bills for him, such as his car-related bills and his phone bill and gave him small amounts of cash.  At some point between 2014 and 2016, Alexander moved away from the farm and began working elsewhere.  In approximately 2018, Alexander Thomas joined the Army and moved away from the Enumclaw area.  Notably, Alexander Thomas did not deposit money into, withdraw money from, or write checks on the A C Services account at White River Credit Union.

Although Alexander Thomas had seen his father perform work for the drainage district before 2012, Alexander Thomas did not know his father to have performed any such work after the two jobs that Alexander Thomas performed in approximately 2012. Alexander Thomas also was not aware of his father hiring anyone to perform work for the drainage district after 2012.

GOVERNMENT'S TRIAL BRIEF - 7
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

                *ii.*     *Kennet Olson*

2

      Kennet Olson has told investigators, and the government expects he will testify,

3

that he owns a farm in DD5.  Approximately 20 to 25 years ago, the ditches on his land

4

were in disrepair, but, at some point around that time, they were cleaned.  After that,

5

Olson does not recall any large projects being done on the ditches until approximately

6

2012, when some of the ditches on Olson's property were cleaned out and that

7

"hundreds" of trees were planted.  Allan Thomas told Olson that Alexander Thomas had

8

done the work.

9

      Also, in approximately 2012, Allan Thomas asked Olson to become a

10

commissioner of DD5.  Allan Thomas told Olson that all Olson would need to do was to

11

keep an eye on the ditches on Olson's own property.  Allan Thomas told Olson that he

12

would not be paid and that, since no one else wanted the job, Allan Thomas could just

13

appoint Olson and that there was no need for an election.

14

      After he became a commissioner, Olson was unaware of any significant work

15

being done on ditches within DD5 prior to the commencement of the investigation that

16

resulted in this case.  In addition, Olson did not approve or sign numerous documents,

17

including numerous documents that appear to bear his signature, that suggest that work

18

occurred.  For example, Olson did not see or approve 11 separate invoices from A.

19

Conservation Services that Allan Thomas provided to the Enumclaw City Attorney in

20

response to a 2017 inquiry.  For bills of this size, Olson would have seen the work

21

described in some of the invoices being done, as it would have occurred either on his

22

property or within viewing distance of his property.

23

      Olson also did not sign most of the Special District Voucher Approval Documents

24

submitted to King County by DD5, which purport to bear his signature, requesting

25

payments to A C Services.  In other words, Olson's signature on these documents was

26

forged.  And Olson never saw or signed supposed minutes of DD5 board meetings for

27

2014 and 2015 that purport to bear his signature (but that misspell his name).  In other

28

words, these signatures also were forged.  Olson has told investigators, and the

GOVERNMENT'S TRIAL BRIEF - 8
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

government expects he will testify, that most of the supposed board meetings referenced in these minutes – that supposedly included discussion of bids, and approval of payments to A C Services - never took place.

### iii.    Witnesses' Accounts

The government expects that witnesses will testify that very little work was performed on DD5 ditches between 2012 and 2017.  Among other witnesses, these include Christopher Searcy, Enumclaw's City Administrator, as well as Alan Predmore, one of the three new commissioners appointed in 2019, following Allan Thomases and Olson's resignations.  In particular, the government expects that Predmore will testify that, when he became a commissioner the drainage districts in DD5 were in a poor state, and that this did not appear that significant work had been done on the ditches for a considerable period of time.

### d.    City of Enumclaw Inquiry

In 2017, the City of Enumclaw was considering starting a stormwater utility and needed to obtain information from DD5 relating to its maintenance of ditches.  Allan Thomas was unresponsive to the city's requests for information.  As a result, in November 2017, the Enumclaw City Attorney submitted a public disclosure request to DD5 for the district's records relating to ditch maintenance.

In response, on November 7, 2017, Allan Thomas sent the City Attorney a letter attaching several documents.  These included invoices from "A. CONSERVATION SERVICES," totaling more than $100,000, for work that supposedly had been performed in 2016 and 2017.  These invoices indicated that this business was located at an address in Enumclaw, Washington.  The address was a previous residence of Joann Thomases' parents.  Some of the invoices included an e-mail address of Joann Thomas.

This response caused the Enumclaw City Attorney to report what it was concerned was fraud on the part of the Thomases to the Enumclaw Police Department.  It also resulted in King County being unwilling to issue further payments to A C Services.

GOVERNMENT'S TRIAL BRIEF - 9
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

e.    *City Biz*

Following the inquiry by the Enumclaw City Attorney, Joann Thomas submitted two warrant requests to King County requesting the issuance of checks to pay for services supposedly performed by a new vendor, City Biz.  The first of these, in October 2018, requested payment in the amount of $24,083.57.  The second, in January 2019, requested payment in the amount of $30,759.51.  King County issued checks making both payments to City Biz.  As noted below, most of these payments ultimately were diverted to the Thomases.  There is evidence that Allan Thomas performed at least some work relating to the projects that supposedly were performed by City Biz.

f.    *Financial Analysis*

Joann Thomas deposited all the King County checks to "AC Services" into the A C Services bank account at White River Credit Union, (with the exception of one check for which the deposit was split between A C Services bank account and Allan and Joann Thomases' personal bank account).  The funds from the King County checks constituted nearly all the deposits into the A C Services account.

Shortly after Joann Thomas deposited each check (or in some cases two checks) into the account, she transferred, paid, or withdrew nearly all the money from the account in a short period of time.  Thus, the balance in the account typically was reduced to less than $1,000, and often to less than $100, within a few days of the deposit.

For example, in May 2016, Joann Thomas submitted a request to King County for payment of $17,096.24 to "AC Services."  King County issued and mailed a check in the requested amount of $17,096.24, which Joann Thomas deposited into the A C Services bank account at White River Credit Union on May 20, 2016.  Within six days, nine withdrawals or transfers from the account reduced the balance in the account to $19.85.

| Date | Transaction Detail | Amount | Balance |
|------|-------------------|--------|---------|
| 5/20/2016 | Deposit | $17.096.24 | $17,071.24 |
| 5/20/2016 | Withdrawal | ($3,000.00) | $14,071.24 |
| 5/23/2016 | Withdrawal | ($200.00) | $13,871.24 |

GOVERNMENT'S TRIAL BRIEF - 10
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

| | | | |
|---|---|---|---|
| 5/23/2016 | Transfer to ****6309-9-2 | ($1,500.00) | $12,371.24 |
| 5/23/2016 | Withdrawal - Check #43286 to Thomas Dairy | ($5,500.00) | $6,871.24 |
| 5/24/2016 | Withdrawal | ($531.39) | $6,339.85 |
| 5/24/2016 | Withdrawal | ($700.00) | $5,639.85 |
| 5/26/2016 | Transfer to ****6309-9 2 | ($620.00) | $5,019.85 |
| 5/26/2016 | Withdrawal - Check #43358 to QHC | ($4,000.00) | $1,019.85 |
| 5/26/2016 | Transfer to ****6309-9 2 | ($1,000.00) | $19.85 |

Similarly, analysis shows that, immediately after receiving each of the payments that it received from King County, City Biz made substantial payments to the Thomases or their dairy farm.  Thus, on November 2, 2018, the day that City Biz deposited the $24,083.57 check from King County, it purchased a cashier's check in the amount of $20,760.00 payable to Allan Thomas, that then was deposited into the joint bank account of Allan Thomas and Joann Thomas.  And, on January 15, 2019, the day after City Biz deposited the $30,759.51 check from King County, City Biz' owner purchased a cashier's check in the amount of $21,125.00 that then was promptly deposited into a joint account controlled by Allan Thomas and Joann Thomas.

In aggregate, financial analysis shows that almost all the money paid by King County to "AC Services" and to City Biz, was diverted to benefit Allan Thomas and Joann Thomas and/or to support their dairy farm.  Between May 2012 and 2019, King County paid A C Services and City Biz a total of $468,165.  After being deposited into the A C Services account, or City Biz' account, this money was disbursed as follows:

| Use of Funds | Amount |
|---|---|
| Cash withdrawals | $71,445 |
| Transfers/checks to the Thomases' personal bank account | $63,373 |
| Checks payable to hay suppliers | $128,678 |
| Checks payable to Thomas Dairy | $115,867 |
| Checks to pay the Thomases' property taxes | $24,019 |
| Payments made to a residential lender for the Thomases' residence | $13,181 |
| Checks from City Biz to the Thomases' farm | $41,885 |
| **Total** | **$458,947** |

GOVERNMENT'S TRIAL BRIEF - 11
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  No payments made from the A C Services account clearly relate to any sort of drainage-
2  ditch related work.

3              g.      *Interview of Allan Thomas and Joann Thomas*

4              Among other fallout from the discovery of the Thomases' fraud, the Washington
5  State Auditor conducted an investigation into DD5.   As part of that investigation, in
6  April 2019, the Auditor's office conducted a joint interview of Allan Thomas, Joann
7  Thomas, and Olson.  During the interview, both Allan Thomas and Joann Thomas
8  implied that Alexander Thomas had performed the work on behalf of DD5 in the
9  preceding years.  For example, when asked about A. Conservation Services, Allan
10 Thomas said that he had recruited Alexander Thomas "to show him how the real call for
11 hard work was . . . [and] once we found out it was kind of legal to do a business with
12 Alex, we put him into play. . . .   When we spoke with the County Assessor, he said it
13 was legal to setup a business.  The only thing he advised against was having people from
14 the district have their wife doing the business or anybody that lived under the same roof
15 as you.  Alex wasn't living under the same roof."

16             Allan Thomas said that Alexander Thomas generally ran the excavator, but that
17 Allan Thomas helped at times.  Allan Thomas said that he, himself, stayed on the job site
18 representing the district, and that he performed all necessary water sampling, so that they
19 did not have to pay anyone else.  Allan Thomas said that this continued until
20 approximately 2017, when Alexander Thomas supposedly sold his animals, and left town
21 to join the Marines.

22             When asked about the expenditures from the A C Services account, Allan Thomas
23 stated that "[s]ome of the hay things are for Alex's cows."  Allan Thomas stated that he
24 would have to go through his books to know what hay bills were "for us."  When asked
25 about the payment of property taxes, Allan Thomas stated that the Thomases were
26 preparing for Alexander Thomas to take over the farm, and that "[w]hoever owns the
27 farm pays the property taxes."

28

GOVERNMENT'S TRIAL BRIEF - 12
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

When asked about cash withdrawals, Allan Thomas stated that "[s]ome of the money that came back to Jo [Joann Thomas] and myself is for when I would take care of some of Alex's business and he would reimburse us, for example fuel . . . [a]nd some of it could have been times I made Alex pay a little bit of rent on some of the equipment that he used that was from the farm." Allan Thomas said that Alexander Thomas even had "his own fuel tank. . . . Usually, Joann[] would pay the bill . . . and then he would reimburse us."

Joann Thomas said "it could have been possible I got cash out for Alex . . . for incidentals or fuel or whatever." Joann Thomas also said "any time money went into our personal account it was either for me to pay Alex's bills and things or it came from cash that I would give him." Joann Thomas also stated "[i]f there were times I needed to pay something for him, which I have records of, . . . I would take care of some of his responsibilities."

These statements are contradicted by other evidence in the case. Most notably, Alexander Thomas denies performing work on behalf of A C Services for DD5 after approximately 2012. Alexander Thomas also will testify that the only cows that he ever owned were three cows that he owned when he participated in 4H while in school and the last of these died before he moved away from the farm, and that he did not have his own fuel tank at the farm. Alexander Thomas did not agree to pay for hay or property taxes for the farm, and that he did not agree to reimburse Allan Thomas or Joann Thomas for any such expenses incurred on his behalf.

h.     The Search of the Thomas's Residence

4.     On July 19, 2019, FBI Special Agents executed a search warrant to search the Thomases residence. A search of the residence resulted in the seizure of numerous documents and digital devices. The government intends to introduce a number of documents found during that search relating to DD5 and A C Services. Among other things, these include A C Services invoices and draft invoices from 2012-13 and 2016-17. Notably, the government did not locate any invoices for the years 2014 and 2015,

GOVERNMENT'S TRIAL BRIEF - 13
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   when it appears that the Thomases did not bother even to create supposed invoices from

2   A C Services to support their fraud.

3        The documents also include a notebook recovered during the search of the

4   Thomases residence.  The cover of this notebook is labeled "Drain dist 5 2018 2019".

5   The notebook includes supposed handwritten minutes for seven purported meetings of

6   DD5 commissioners during the year 2016, that, like minutes discussed above for the

7   years 2014 and 2015, appear to be fictitious.  The government expects that Olson will

8   testify that the meetings referenced in the notes did not take place, and that he neither

9   reviewed nor approved the invoices referenced in the minutes.

10  **B.    Procedure**

11       Allan Thomas and Joann Thomas originally were charged by complaint in this

12  case on September 27, 2019.  Dkt. 1.  They made their initial appearance three days later

13  and were released on bond.  *See* Dkt. 9.  On October 23, 2019, they were indicted.  Dkt.

14  25.  On September 9, 2020, the grand jury returned a Superseding Indictment adding

15  additional charges against both defendants.  Dkt. 40.

16       The Superseding Indictment charges Allan Thomas and Joann Thomas with the

17  following offenses:

18        • Count 1 – Conspiracy to Commit Mail Fraud, Wire Fraud, Aggravated
19          Identity Theft, and Money Laundering in violation of 18 U.S.C. § 371

20        • Counts 2 to 5 – Mail Fraud, in violation of 18 U.S.C. § 1341

21
22        • Counts 6 to 9 – Wire Fraud, in violation of 18 U.S.C. § 1343

23        • Counts 10 and 11 – Aggravated Identity Theft, in violation of 18 U.S.C.
24          § 1028A

25        • Counts 12 to 15 – Money Laundering, in violation of 18 U.S.C. § 1957
26  //
27  //
28

### III.    ELEMENTS OF THE OFFENSES

**A.    Conspiracy**

The elements of Conspiracy to Commit Mail Fraud, Wire Fraud, Aggravated Identity Theft, and Money Laundering as charged in Count 1 are:

*First*, beginning in or about 2012, and ending on or about January 15, 2019, there was an agreement between two or more persons to commit at least one crime as charged in the indictment; and

*Second*, the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; and

*Third*, one of the members of the conspiracy performed at least one overt act on or after November 6, 2015, for the purpose of carrying out the conspiracy.

**B.    Mail Fraud**

The elements of Mail Fraud, as charged in Counts 2 to 5, are:

*First*, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

*Second*, the statements made, or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

*Third*, the defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and

*Fourth*, the defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

**C.    Wire Fraud**

The elements of Wire Fraud, as charged in Counts 6 to 9, are:

*First*, the defendant knowingly participated in, devised, or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means

GOVERNMENT'S TRIAL BRIEF - 15
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of false or fraudulent pretenses, representations, or promises, or omitted facts. Deceitful statements of half-truths may constitute false or fraudulent representations;

*Second*, the statements made, or facts omitted as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property;

*Third*, the defendant acted with the intent to defraud, that is, the intent to deceive and cheat; and

*Fourth*, the defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.

**D.     Aggravated Identity Theft**

The elements of Aggravated Identity Theft, as charged in Counts 10 and 11, are:

*First*, the defendant knowingly transferred, possessed, or used without legal authority a means of identification of another person; and

*Second*, the defendant knew that the means of identification belonged to a real person; and

*Third*, the defendant did so during and in relation to the mail fraud and wire fraud schemes alleged in the indictment.

**E.     Money Laundering**

The elements of Money Laundering, as charged in counts 12-15, are:

*First*, the defendant knowingly engaged or attempted to engage in a monetary transaction;

*Second*, the defendant knew the transaction involved criminally derived property;

*Third*, the property had a value greater than $10,000;

*Fourth*, the property was, in fact, derived from the mail fraud and wire fraud scheme alleged in the indictment; and

*Fifth*, the transaction occurred in the United States.

## IV.     LEGAL ISSUES

**A.     The Law of Conspiracy.**

GOVERNMENT'S TRIAL BRIEF - 16
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Allan Thomas and Joann Thomas are charged with conspiring with each other to commit the offenses of mail fraud, wire fraud, aggravated identity theft, and money laundering.  One becomes a member of a conspiracy by willfully participating in the unlawful plan with the intent to advance or further some object or purpose of the conspiracy, even though the person does not have full knowledge of all the details of the conspiracy.  *See* Ninth Circuit Model Jury Instruction § 9.19.

### 1.    Agreement and Knowledge.

The agreement to accomplish an illegal object need not be a formal agreement.  It is sufficient to show that the conspirators came to a mutual understanding to accomplish an unlawful purpose.  *American Tobacco Co. v. United States*, 328 U.S. 781, 809 10 (1946); *United States v. Kiriki*, 756 F.2d 1449, 1453 55 (9th Cir. 1985).  Indeed, the agreement "may consist of nothing more than a tacit understanding." *United States v. Mohr*, 728 F.2d 1132, 1135 (8th Cir. 1984).

An agreement constituting a conspiracy may be inferred from the acts of the parties, *see United States v. Fulbright*, 105 F.3d 443, 448 (9th Cir. 1997), *overruled on other grounds* in *United States v. Heredia*, 483 F.3d 913, 921 (9th Cir. 2007) (*en banc*), such as through evidence of coordinated activity between the defendants.  *United States v. Hegwood*, 977 F.2d 492, 497 (9th Cir. 1992).  It is not necessary to show that each co-conspirator was aware of all the details of the conspiracy or of the parties involved.  When one joins an illegal venture, one becomes part of the scheme although he or she may know only of his or her own share of wrongdoing.  *Blumenthal v. United States*, 332 U.S. 539, 556-57 (1947); *Chavez v. United States*, 275 F.2d 813, 817 (9th Cir. 1960).  Indeed, "once a conspiracy exists, evidence establishing beyond a reasonable doubt a defendant's connection with the conspiracy, even though the connection is slight, is sufficient to convict the defendant of knowing participation in the conspiracy." *United States v. Penagos*, 823 F.2d 346, 348 (9th Cir. 1987).

### 2.    Evidence of Conspiratorial Conduct.

GOVERNMENT'S TRIAL BRIEF - 17
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  "The rule is well established that the government in a conspiracy case may submit

2  proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts

3  alleged in the indictment." *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011);

4  *accord United States v. Montgomery*, 384 F.3d 1050, 1061-62 (9th Cir. 2004) (acts that

5  occurred within the temporal scope of the conspiracy and were inextricably intertwined

6  with the conspiracy are not subject to Rule 404(b) analysis.  Moreover, such inextricably

7  intertwined acts are considered direct evidence of the offense.  *See United States v.*

8  *Ramirez-Jiminez*, 967 F.2d 1321, 1327 (9th Cir. 1992).

9  **B.    Reference to the Penalties that Defendants Face**

10  If convicted at trial, the defendants' face the potential of lengthy prison sentences,

11  and the Aggravated Identity Theft charges alleged in Counts 10 and 11 carry a mandatory

12  minimum term of imprisonment.

13  "It has long been the law that it is inappropriate for a jury to consider or be

14  informed of the consequences of their verdict." *United States v. Frank*, 956 F.2d 872,

15  879 (9th Cir. 1992); *see also Rogers v. United States*, 422 U.S. 35, 40 (1975) (jury should

16  have been admonished that it "had no sentencing function and should reach its verdict

17  without regard to what sentence might be imposed"); *United States v. Reed*, 726 F.2d

18  570, 579 (9th Cir. 1984) (trial judge properly instructed jury that the "punishment

19  provided by law for the offenses charged in the indictment are matters exclusively within

20  the province of the court.  It should never be considered by the jury in any way in

21  arriving at an impartial verdict as to the guilt or innocence of the accused").

22  Information about penalties draws the attention of the jury away from its chief

23  function as the trier-of-fact, opens the door to compromise verdicts, and confuses the

24  issues to be decided. *United States v. Olano*, 62 F.3d 1180, 1202 (9th Cir. 1995).  Simply

25  put, "it is inappropriate for a jury to consider or be informed of the consequences of their

26  verdict." *United States v. Frank*, 956 F.2d 872, 879 (9th Cir. 1991); *see also* 9th Cir.

27  Model Crim. Jury Instr., § 7.4 (2010) ("The punishment provided by law for this crime is

28

GOVERNMENT'S TRIAL BRIEF - 18
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

for the court to decide. You may not consider punishment in deciding whether the government has proved its case against the defendant[s] beyond a reasonable doubt.").

Accordingly, it would be improper for the defense to make any reference to the defendants' potential punishment in the presence of the jury at any point in the proceedings. References to penalties could be as overt as "You understand the defendant is facing decades in prison if convicted," or more subtle, such as "the defendant is facing a lot of time," "this case has serious consequences for the defendant," "the defendant's liberty is at stake in this trial," or "your decision will have consequences for a long time to come." All such references are improper.

## C.    References to Allan Thomases' Medical Issues

Similarly, it would be improper for the defense to make any reference to defendant Allan Thomases' medical issues. None of the underlying medical issues raised by the defense are related to Allan Thomases' mental condition, and therefore, they are not relevant during the trial.

## V.    EVIDENTIARY ISSUES

## A.    Statements of Defendants

The United States intends to introduce evidence regarding statements made by each of defendants Allan Thomas and Joann Thomas, including the statements they made: (1) to King County in which they: (i) requested that King County levy taxes on the owners of property within DD5, (ii) sent warrant requests to King County; and (iii) communicated about these issues; (2) to other individuals, including Kennet Olson, Alexander Thomas, and Alan Predmore (one of the current DD5 Commissioners); and (3) in their May 2019 interview with the Auditor's Office. A defendant's own statements are admissible, non-hearsay admissions of a party-opponent when offered into evidence by the United States. *See* Fed. R. Evid. 801(d)(2)(A).

The United States may offer all, some, or none of a defendant's statements at trial under Rule 801(d)(2). A defendant, however, cannot use this rule to offer his *own* prior out-of-court statements. Rule 801(d)(2) is unavailable to a defendant, since he would be

GOVERNMENT'S TRIAL BRIEF - 19
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1    the proponent of the evidence and, where he seeks to introduce it, it is not offered against

2    him.  *United States v. Ortega*, 203 F.3d 675, 682 (9th Cir. 2000); *United States v.*

3    *Fernandez*, 839 F.2d 639, 640 (9th Cir. 1988).  As a result, the hearsay rule bars a

4    defendant from introducing his own prior statements.  *United States v. Mitchell*, 502 F.3d

5    931, 964-65 (9th Cir. 2007).

6          If the defendants wish to tell their "side" of the story, they must take the stand and

7    testify under oath and be subject to cross-examination.  Indeed, even where the United

8    States elicits the inculpatory portion of a defendant's oral statement from a witness, the

9    defendant is not entitled to elicit any exculpatory portion on cross-examination.  *Ortega*,

10   203 F.3d at 682.  The rule of completeness (Fed. R. Evid. 106) has no place in this

11   analysis since it applies only to written or recorded statements.  *Id.*

12   **B.     Prior Consistent Statements.**

13         The government may offer prior consistent statements Alexander Thomas, Kennet

14   Olson, or others.  All such statements are contained in discovery previously produced to

15   the defense.  Rule 801(d)(1)(B), provides that a statement is not hearsay where:

16            [t]he declarant testifies at the trial or hearing and is subject to
17            cross-examination concerning the statement, and the statement
              is . . . (B) consistent with the declarant's testimony and is
18            offered to rebut an express or implied charge against the
              declarant of recent fabrication or improper influence or motive.
19

20   Fed. R. Evid. 801(d)(1)(B).  The Ninth Circuit has characterized the requirements for

21   admissibility under Rule 801(d)(1)(B) as follows:

22              (1) The declarant must testify at trial and be subject to
23            cross-examination;

24              (2) There must be an express or implied charge of recent
25            fabrication or improper influence or motive of the declarant's
              testimony;
26

27              (3) The proponent must offer a prior consistent
28            statement that is consistent with the declarant's challenged in-
              court testimony; and

GOVERNMENT'S TRIAL BRIEF - 20
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

(4) The prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*Arizona v. Johnson*, 351 F.3d 988, 998-99 (9th Cir. 2003); *see also United States v. Chang da Liu*, 538 F.3d 1078, 1086 (9th Cir. 2008).  Courts have consistently recognized that "[t]he possible existence of an earlier and different motive to lie would not prevent the admission of a prior consistent statement designed to rebut a subsequent different claim of fabrication."  *United States v. DeSimone*, 488 F.3d 561, 575 (1st Cir. 2007); *United States v. Wilson*, 355 F.3d 358, 361-62 (5th Cir. 2003); *United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998) (interpreting the armed forces verbatim counterpart to Rule 801(d)(1)(B)).  Once admitted, prior consistent statements are substantive evidence. Fed. R. Evid. 801 advisory committee's notes; *Johnson*, 351 F.3d at 998.

## C.   Statements Offered for a Non-Hearsay Purpose

A statement is hearsay if it is (1) an assertion that (2) is made out of court and (3) is offered to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).  Many out of court statements are not hearsay because they either are not assertions, or they are not offered to prove the truth of the matter asserted.  *United States v. Oguns*, 921 F.2d 442, 449 (2nd Cir. 1990) (questions are not assertions and are thus not hearsay). Furthermore, many statements that meet the definition of hearsay are admissible under one or more of the many exceptions to the hearsay rule.

In this case, the United States may offer out of court statements, not to prove the truth of the matters asserted, but merely to give context to the defendant's statements. Therefore, the statements would not constitute "hearsay" within the definition of Rule 801.  *United States v. Catano*, 65 F.3d 219, 225 (1st Cir. 1995) (informant's part of conversation with agent was not hearsay, because it was offered for context and not to prove the truth of the informant's statements).   Specifically, statements made by King County employees, Olson, Alexander Thomas, Auditor's Office employees, and others to

GOVERNMENT'S TRIAL BRIEF - 21
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1   the defendants are not hearsay because they are not offered for their truth, but rather to

2   provide context for the statements made by the defendants.

3   **D.      Statements in Furtherance of the Conspiracy.**

4          Under Evidence Rule 801(d)(2)(E), a statement made by a co-conspirator is

5   admissible if the government establishes by a preponderance of the evidence:  1) the

6   existence of a conspiracy; 2) the defendant's connection to it, and 3) that the statement

7   was made during and in furtherance of the conspiracy.  *Bourjailly v. United States*, 483

8   U.S. 171, 175 (1987); *United States v. Fleishman*, 684 F.2d 1329, 1337 (9th Cir. 1982).

9   The statements themselves may help establish their admissibility and reliability under

10  801(d)(2)(E).  *See Bourjailly*, 483 U.S. at 175; *see also United States v. Schmit*, 881 F.2d

11  608 (9th Cir. 1989).

12         There must be some evidence, aside from the proffered statements, of the

13  existence of the conspiracy and the defendant's involvement.  *United States v. Gordon*,

14  844 F.2d 1397, 1402 (9th Cir. 1988).  Circumstantial evidence is sufficient.  *See e.g.,*

15  *United States v. Mason*, 658 F.2d 1263, 1269 (evidence that defendant visited

16  coconspirator's residence just prior to time coconspirator advised he had drugs was

17  sufficient to connect defendant to the conspiracy).

18         There is more than adequate evidence to show that a conspiracy existed, and that

19  Allan Thomas and Joann Thomas were members of the conspiracy.  For example, the

20  Thomases both signed and/or submitted to King County the Special District Voucher

21  Approval Documents that contained Olson's forged signature, and both shared in the

22  illicit gains from their fraudulent scheme.

23         To satisfy the "furtherance" requirement, the statement must be said to "'further

24  the common objectives of the conspiracy,' or, 'set in motion transactions that [are] an

25  integral part of the [conspiracy].'"  U*nited States v. Layton*, 720 F.2d 548, 555 (9th Cir.

26  1983), *overruled on other grounds*, *United States v. W.R. Grace*, 526 F.3d 499, 506 (9th

27  Cir. 2008).  Examples of "in furtherance" include statements that keep a conspirator

28  abreast, *United States v. Andersson*, 813 F.2d 1450, 1456 (9th Cir. 1987); induce

GOVERNMENT'S TRIAL BRIEF - 22
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

continued participation, *United States v. Eaglin*, 571 F.2d 1069, 1083 (9th Cir. 1977);
allay fears, *Layton*, 720 F.2d at 557 (9th Cir. 1983); explain co-conspirators' roles,
*United States v. Moody*, 778 F.2d 1380, 1382-83 (9th Cir. 1985), *amended by* 791 F.2d
707 (9th Cir. 1986); or aim to avoid detection, *United States v. Sears*, 663 F.2d 896, 905
(9th Cir. 1981).  The focus is on the declarant's intent in making the statement, not on its
actual effect of promoting the goals of the conspiracy.  *United States v. Zavala Serra*, 853
F.2d at 1516; *United States v. Layton*, 720 F.2d 548, 557 n.5 (9th Cir. 1983).

It is not necessary that the statement be made to another member of the conspiracy
for it to come under Rule 801(d)(2)(E).  *See Zavala Serra*, 853 F.2d at 1516 (statements
to government informant); *United States v. Taylor*, 802 F.2d 1108, 1117 (9th Cir. 1986)
(statements to undercover FBI agent); *United States v. Echeverry*, 759 F.2d 1451, 1457
(9th Cir. 1985) (statements to undercover DEA agent); *United States v. Smith*, 623 F.2d
627, 631 (9th Cir. 1980) (statement to informant).

Thus, each of the Thomases' statements made in furtherance of the conspiracy,
whether to King County, Alexander Thomas, Kennet Olson, or the Auditor's Office are
admissible as to both defendants as statements of a co-conspirator in furtherance of the
conspiracy.

## E.   Business and Governmental Records.

The government intends to offer into evidence business records from various
sources (primarily banks and King County).  The business record exception allows a
record to be admitted if it is made at or near the time of the events set forth therein, by a
person with knowledge, and is kept in the course of regularly conducted business activity,
and if it is the regular practice of the business to make the record.   Fed. R. Evid. 803(6).
Any person familiar with the business record keeping practices of the business who can
identify the record at issue as having been made in the ordinary course of business is a
sufficient foundational witness.  Personal knowledge of the document is not required and
does not affect its admissibility.  *United States v. Pitman*, 475 F.2d 1335, 1337 (9th Cir.
1973); *see United States v. Childs*, 5 F.3d 1328, 1334 (9th Cir. 1993) (the phrase "other

GOVERNMENT'S TRIAL BRIEF - 23
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1  qualified witness" is broadly interpreted to require "only that the witness understand the

2  record-keeping system" at the particular business).

3      A record generated by a third party and received and relied upon in the ordinary

4  course, such as an invoice, becomes a business record of the company relying upon it. *Id*.

5  at 1333-34; *see United States v. Jawara*, 474 F.3d 565, 585 (9th Cir. 2007) ("[W]e would

6  have no trouble concluding that a college in the United States was a proper custodian of

7  its students' SAT results, even though the SAT results were actually prepared by another

8  entity"). Incompleteness, ambiguities, and inaccuracies in records go to the weight to be

9  given the evidence, not to its admissibility. *United States v. Catabran*, 836 F.2d 453, 458

10  (9th Cir. 1988).

11      The government has provided defendants copies of the records and custodian

12  certifications during the course of discovery. Before the end of this month, the

13  government will provide the defense with a list of specific records that it intends to admit

14  based upon these certifications. The government does not anticipate the defense having a

15  valid basis to object to these records. Absent a valid objection, these records are

16  admissible under 902(11) of the Federal Rules of Evidence.

17      To the extent that the defense has not confirmed, by the time of the pretrial

18  conference in this case, that they do not object to records identified by the government,

19  the government intends to raise the issue at the pretrial conference and to ask for a ruling

20  from the Court that the records are, in fact, admissible under Rule 902(11), subject, of

21  course, to any relevance objection that defendants may have.

22  **F.    Physical Evidence Seized.**

23      The United States will introduce at trial physical documents seized during the

24  search warrant executed at the Thomases residence during this investigation. Assuming

25  defense is willing, the government intends to call a single agent who participated in the

26  search to authenticate these items.

27

28  **G.    Recalling Law Enforcement Witnesses**.

GOVERNMENT'S TRIAL BRIEF - 24
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

1    The government requests leave of Court to re-call one or more law enforcement

2    witnesses during the course of the trial, in the event that becomes necessary.  In

3    particular, the government may want to recall the case agent, IRS Agent Ian Mitchell.

4    The government will attempt to limit the extent to which it is necessary to recall

5    witnesses.

6    **H.    Admissibility of Map.**

7        The government expects to offer a map of DD5 through a witness with personal

8    knowledge of DD5's geographical area.

9    **I.    Admissibility of Summary Charts.**

10        The investigation and prosecution of this case has involved extensive review of

11   voluminous bank records and other documents.  The government intends to present some

12   of this evidence through a forensic accountant or the case agent in the form of summary

13   testimony and charts.  The government has provided the defense with all the underlying

14   materials and will provide drafts of each of these summary charts in advance of trial.

15        Federal Rule of Evidence 1006 states that: "[t]he proponent may use a summary,

16   chart, or calculation to prove the content of voluminous writings, recordings, or

17   photographs that cannot conveniently be examined in court."  The proponent of a

18   summary under Rule 1006 must establish that the underlying materials cannot be

19   conveniently examined in court, and that they are admissible at trial, as conditions

20   precedent to introduction of the summary into evidence.  *Amarelu v. Connell*, 102 F.3d

21   1494, 1516 (9th Cir. 1997); *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir.

22   1988); *United States v. Johnson*, 594 F.2d 1253, 1257 (9th Cir. 1979).  The proponent of

23   a summary also must establish that the underlying documents were made available to the

24   opposing party for inspection.  *Paddack v. Dave Christensen, Inc*., 745 F.2d 1254, 1259

25   (9th Cir. 1984).  Summaries must fairly represent the underlying documents, and their

26   admission into evidence is left to the trial court's discretion.  *Davis & Cox v. Summa*

27   *Corp*., 751 F.2d 1507, 1516 (9th Cir. 1985), *superseded on other grounds by Northrup*

28   *Corp. v. Triad Intern. Mktg., SA*, 842 F.2d 1154 (9th Cir. 1988).

GOVERNMENT'S TRIAL BRIEF - 25
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

All of these requirements are met in this case.  If the government were to publish all of the relevant bank records and documents obtained from the defendants' computer, the jury would be faced with reviewing thousands of pages of documents.   The government has provided the defense with copies of all the underlying records.  The summary testimony and charts are accurate and non-prejudicial.

Rule 1006 does not require that it literally be impossible for the fact finder to examine the underlying records before a summary may be admitted.  *United States v. Stephens*, 779 F.2d 232, 238-39 (5th Cir. 1985); *United States v. Scales*, 594 F.2d 558, 562 (6th Cir. 1979).  Rather, Rule 1006 contemplates that summaries of voluminous records may be used without introducing each and every underlying document into evidence.  *Scales*, 594 F.2d at 562.  Furthermore, the fact that some of the underlying documents are already in evidence does not mean that they can be "conveniently examined in court."  *United States v. Stephens*, 779 F.2d at 239; *United States v. Lemire*, 720 F.2d 1327, 1347 (D.C. Cir. 1983).

The Ninth Circuit has affirmed the admission as substantive evidence of a wide variety of summary charts pursuant to Rule 1006 where (as in this case) such charts are based on the sponsoring witnesses' out-of-court review of voluminous evidence.  *See, e.g., United States v. Shirley*, 884 F.2d 1130, 1133 (9th Cir. 1989) (DEA agent presented chart summarizing information about telephone calls made to and from phones associated with defendants, relying on review of phone records, rental records, jail records, and other information); *United States v. Meyers*, 847 F.2d 1408, 1412 (9th Cir. 1988) (chart summarizing phone records and law enforcement surveillance reports); *United States v. Catabran*, 836 F.2d 453, 456-458 (9th Cir. 1988) (charts summarizing voluminous computer printouts and inventory records in bankruptcy fraud prosecution); *United States v. Gardner*, 611 F.2d 770, 776 (9th Cir. 1980) (IRS agent presented chart summarizing assets, liabilities, and expenditures of defendant in tax prosecution).

Under the cited authority, the government respectfully requests that these summaries and charts be ruled substantively admissible.

GOVERNMENT'S TRIAL BRIEF - 26
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

**J.     Exclusion of Witnesses**

Pursuant to Rule 615 of the Federal Rules of Evidence, the government respectfully requests that witnesses be excluded from the courtroom, with the exception of IRS Agent Ian Mitchell, who is a case agent and who should be permitted to sit at counsel table.  *United States v. Thomas*, 835 F.2d 219, 222-23 (9th Cir. 1987); *see also United States v. Machor*, 879 F.2d 945, 953-54 (1st Cir. 1989).

## VI.     FORFEITURE

The United States seeks to forfeit, from each defendant in this case, a sum of money reflecting the proceeds each obtained from their commission of Conspiracy to Commit Mail Fraud and Wire Fraud (Count 1), Mail Fraud (Counts 2 – 5), and Wire Fraud (Counts 6 – 9). All proceeds of these offenses are forfeitable pursuant to 18 U.S.C. § 981(a)(1)(C), by way of 28 U.S.C. § 2461(c). The United States also seeks to forfeit, from each defendant, a sum of money reflecting their share of the funds involved in their commission of Money Laundering (Counts 12 – 15). All property involved in these offenses is forfeitable pursuant to 18 U.S.C. § 982(a)(1).

The defendants jointly obtained these criminal proceeds during their marriage, and they were spent for the benefit of the marital community. As such, the United States seeks a forfeiture money against each defendant reflecting 50% of the total proceeds they jointly obtained. The United States expects the evidence at trial will establish that the defendants jointly obtained approximately $458, 947 in proceeds from the Conspiracy offense. The Conspiracy charge covers the same time period as the other offenses and encompasses the same proceeds. If the defendants are convicted of the Conspiracy offense, therefore, the United States only seeks forfeiture based on that offense – i.e., it will ask the Court to enter a forfeiture money judgment against each defendant in the approximate amount of $229,473. If, however, the defendants are not convicted of the Conspiracy offense, but are convicted of other offenses, the United States will seek to forfeit, from each defendant, a sum of money reflecting their 50% share of the proceeds from, and/or property involved in, those other conviction offenses.

GOVERNMENT'S TRIAL BRIEF - 27
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

As required by Fed. R. Crim. P. 32.2(a), the United States provided notice to the defendants of its intent to seek forfeiture in both the initial and superseding Indictments (Dkt. Nos. 25 & 40).

### 1. Legal Standard for Forfeiture.

Criminal forfeiture is a form of punishment that is imposed as part of a criminal sentence. *Libretti v. United States*, 516 U.S. 29, 39 – 40 (1995). For the government to criminally forfeit property, there must be a predicate criminal conviction, a statute authorizing forfeiture for the crime of conviction, and evidence to support the statutorily required nexus between the property and the crime of conviction. *See e.g., United States v. Garcia-Guizar,* 160 F.3d 511, 518 – 20 (9th Cir. 1998) (reviewing these requirements). With respect to the required nexus, the government must establish the forfeitability of the relevant property by a preponderance of the evidence. *United States v. Martin,* 662 F.3d 301, 307 (4th Cir.2011); see also *United States v. Rutgard*, 116 F.3d 1270, 1293 (9th Cir. 1997); *United States v. Hernandez-Escarsega,* 886 F.2d 1560, 1576 – 77 (9th Cir. 1989). In other words, depending on the relevant forfeiture statute, the government must present evidence that establishes the relevant property is, "more likely than not," forfeitable as *proceeds* of the crime*, property that *facilitated* the crime*, and/or property *involved in* the crime. This lower standard of proof "is constitutional because the criminal forfeiture provision does not itself describe a separate offense but is merely an 'additional penalty' for an offense that must be proved beyond a reasonable doubt." *United States v. Garcia-Guizar,* 160 F.3d at 518 (citing *United States v. Hernandez-Escarsega,* 886 F.2d at 1577).

Here, there is statutory authority, pursuant to 18 U.S.C. § 981(a)(1)(C) (by way of 28 U.S.C. § 2461(c)), to forfeit the *proceeds* the defendants obtained from three of the offenses with which they are charged: Conspiracy to Commit Mail Fraud and Wire Fraud (Count 1), Mail Fraud (Counts 2 – 5), and Wire Fraud (Counts 6 – 9). There is also statutory authority, pursuant to 18 U.S.C. § 982(a)(1), to forfeit property *involved in* the Money Laundering offenses. In fact, forfeiture for all of these offenses is a mandatory part of any criminal sentence. *See* 28 U.S.C. § 2461(c) and 18 U.S.C. § 982(a)(1) (both

GOVERNMENT'S TRIAL BRIEF - 28
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

providing the court *shall order* forfeiture when sentencing a defendant on these charges). The United States expects the evidence at trial will establish, to a preponderance, that the Defendants jointly obtained approximately $458,947 in proceeds from the Conspiracy offense.

As permitted by Fed. R. Crim. P. ("Rule") 32.2 and approved in case law, the United States seeks to forfeit these proceeds in the form of "personal money judgments" entered against each of the defendants. *See* Rule 32.2(b)(1)(A) and *United States v. Nejad*, 933 F.3d 1162 (9th Cir. 2019) (affirming a district court's authority to enter forfeiture money judgments and reciting circuit precedent). The government typically forfeits a money judgment when the defendant has spent or otherwise disposed of the criminal proceeds, so they are no longer available to forfeit directly. *See United States v. Nejad,* 933 F.3d at 1165 (recognizing the necessity of forfeiture money judgments in this circumstance and holding "a contrary rule … would allow an insolvent defendant to escape the mandatory forfeiture penalty Congress has imposed simply by spending or otherwise disposing of his criminal proceeds before sentencing").

### 2.    Forfeiture Process.

Rule 32.2 sets out the procedures for determining the forfeitability of property in a criminal case. Forfeitures are decided after a guilty verdict is returned on a count that supports the forfeiture. *See* Rule 32.2(b)(1)(A). At that juncture, the specific question for the fact finder is "whether the government [has established the] requisite nexus between the property and the offense." Rule 32.2(b)(1)(A). Although a defendant has a right for a jury to determine the forfeitability of most property (Rule 32.2(b)(5)), no such right exists for a forfeiture money judgment. In the case of a money judgment, it is the Court that determines the amount of that money judgment. *See* Rule 32.2(b)(1)(A) ("If the government seeks a personal money judgment, the court must determine the amount of money that the defendant will be ordered to pay."); *see also United States v. Tedder,* 403 F.3d 836, 841 (7th Cir. 2005) ("Rule 32.2 does not entitle the accused to a jury's decision on the amount of the forfeiture") and *United States v. Phillips,* 704 F.3d 754, 771 (9th

GOVERNMENT'S TRIAL BRIEF - 29
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

Cir. 2012) ("Given that the only issue here was a monetary forfeiture, no jury determination was necessary.").

As forfeiture is determined post-conviction, and is considered part of sentencing, the rules of evidence do not strictly apply to forfeiture proceedings. *See e.g., United States v. Hatfield,* 795 F. Supp.2d 219, 229 – 30 (E.D.N.Y. 2011) (holding neither the Federal Rules of Evidence nor *Daubert* apply to forfeiture hearings) and *United States v. Creighton,* 52 Fed. Appx. 31, 35-36 (9th Cir. 2002) ("hearsay evidence is permissible at sentencing and does not, *per se*, lack sufficient indicia of reliability"). The Court may consider any evidence that is "relevant and reliable." Fed. R. Crim. P. 32.2(b)(1)(B). This includes any evidence presented by the parties during trial on the substantive criminal offenses. *See id.* ("The court's [or jury's forfeiture] determination may be based on evidence already in the record …."); *see also United States v. Newman*, 659 F.3d 1235, 1244 – 45 (9th Cir. 2011) (same).

Here, the United States expects testimony and related exhibits presented in its case-in-chief will establish that the defendants jointly obtained approximately $458,947 in proceeds from the Conspiracy offense. Immediately following the defendants' conviction of that offense, the United States will present the Court with proposed orders forfeiting, from each defendant, a sum of money reflecting their 50% share of those proceeds. If the defendants are not convicted of that offense, but are convicted of other offenses, the United States will present the Court with proposed orders forfeiting, from each defendant, their 50% share of the proceeds from, and/or property involved in, the conviction offenses.

GOVERNMENT'S TRIAL BRIEF - 30
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

1

## VII.  <u>CONCLUSION</u>

2          The United States is not aware of other legal issues that are likely to arise during

3    the course of this trial.  If other issues do arise, the government requests the opportunity

4    to address those issues by way of a supplemental brief or briefs.

5          DATED:  November 22, 2021.

6                                                  NICHOLAS W. BROWN
                                                   United States Attorney
7

8                                                  *s/ Justin W. Arnold*

9                                                  JUSTIN W. ARNOLD
                                                   ANDREW C. FRIEDMAN
10                                                 Assistant United States Attorneys
                                                   700 Stewart Street, Suite 5220
11                                                 Seattle, Washington 98101
                                                   Phone: (206) 553-5558
12                                                 E-mail: Justin.Arnold@usdoj.gov
13                                                         Andrew.Friedman@usdoj.gov

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S TRIAL BRIEF - 31
*United States v. Allan B. Thomas & Joann E. Thomas*, CR19-210 RAJ

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970